Van C. BARNES, Appellee and Cross-Appellant,

v.

NORFOLK SOUTHERN RAILWAY COMPANY, Appellant and Cross-Appellee.

No. 9115.

United States Court of Appeals
Fourth Circuit.

Argued Nov. 14, 1963.

Decided April 14, 1964.

Cadwallader J. Collins, Raleigh, N. C., and William C. Worthington, Norfolk, Va. (Worthington, White & Harper, Norfolk, Va., on brief), for appellant and cross-appellee.

Howard I. Legum and Louis B. Fine, Norfolk, Va. (Fine, Fine, Legum & Schwan, Norfolk, Va., on brief), for appellee and cross-appellant.

Before BOREMAN and J. SPENCER BELL, Circuit Judges, and BARKSDALE, District Judge.

J. SPENCER BELL, Circuit Judge.

This is an appeal from a district court judgment entered on a jury verdict awarding appellee, Van C. Barnes, $80,000 as damages for injuries received when he fell from the caboose of a train being operated by appellant, Norfolk Southern Railway Company. The action was brought under The Federal Employers' Liability Act, 53 Stat. 1404 (1939), 45 U.S.C.A. § 51 [hereinafter FELA].

The basic facts are largely undisputed. On the morning of August 21, 1959, Barnes was employed as a flagman on appellant's southbound freight train out of Norfolk, Virginia. The train's crew, in addition to Barnes, consisted of a conductor, a brakeman, a fireman, and an engineer. At the time of the accident the latter three men were stationed in the engine; Barnes and the conductor were in the caboose. At 7:49 A.M. the train stopped ¾ of a mile north of Plymouth, North Carolina, to carry out switching operations. These operations were completed at approximately 8:25 A.M. During the interval, word was received via a wayside telephone that no orders would be waiting at the Plymouth station and that the train might proceed on through Plymouth without stopping.

Acting on this information, the engineer placed the engine in full throttle and entered into the Plymouth yard at a speed estimated at between 20 and 30 mph. As the train rounded a curve some 675 feet north of the station, the fireman noticed that the arm of the station semaphore showed red and was extended in a horizontal position, indicating that the train should stop. This information was imparted to the engineer, who had the brakeman confirm the stop signal. Upon confirmation, the engineer followed the regular procedure of checking the accuracy of the semaphore by sounding the train's whistle. When the semaphore remained fixed in a stop position, the engineer applied full brake pressure, causing the train to rapidly decelerate. When the engine reached a point almost opposite the station house, the fireman observed a railway employee come out and signal the train to stop by waving a red flag. The train continued to decelerate and as the engine came to a complete halt some 700 feet beyond the station house, the slack of 128 cars ran out, causing a jolt in the caboose where Barnes was engaged in removing a taillight that had been burning during the night. The jolt caused Barnes to lose his hold on a vertical grabiron that he had been gripping, to fall to the ground, and to severely injure his right leg.

Based on the foregoing set of facts, Barnes brought a tort action against appellant, alleging that appellant's engineer had operated the train at an excessive rate of speed under the circumstances and had not kept the train under proper control. Barnes also alleged that the crew had failed to keep a proper lookout. Barnes' action, thus, was predicated upon three grounds of negligence: excessive speed, improper control, and improper lookout. Appellant, on the other hand, denied Barnes' allegations of negligence and contended that his injuries

were the result of his own lack of due care. The trial judge submitted to the jury the issues of appellant's primary negligence and Barnes' contributory negligence and the jury returned a general verdict in favor of Barnes.

Appellant excepted to the submission of the issues of Barnes' contributory negligence, and on appeal urges that the trial judge should have instructed the jury that Barnes was contributorily negligent as a matter of law. At the trial, appellant contended that Barnes had been gripping an unsafe vertical grabiron in removing the taillight and had failed to utilize the safer diagonal grabiron furnished by appellant for this purpose. Appellant also argued that Barnes chose an inopportune moment to remove the taillight and should have chosen a time when the train had been stopped, e. g., during switching operations outside Plymouth.

Barnes maintains that the trial judge was fully justified in submitting the issue of contributory negligence to the jury in light of evidence introduced by him to refute appellant's contentions. Barnes presented evidence tending to prove that the vertical grabiron used by him was not inherently dangerous, that railroad operating rules did not require him to use the diagonal grabiron, and further, that he had chosen an appropriate time to remove the taillight.

■■ In returning a general verdict in favor of Barnes, the jury necessarily found appellant negligent, but may or may not have found Barnes contributorily negligent. Under FELA, contributory negligence is not an absolute bar to a plaintiff's recovery but serves to reduce his award proportionately. We cannot say with assurance, therefore, that the jury did not find Barnes contributorily negligent. Moreover, we think the issue of contributory negligence was one over which reasonable men might differ and warranted submission to the jury.

Appellant raises several other grounds for reversal. The first of these is that the trial judge committed fatal error in the manner in which he submitted to the jury the question of appellant's primary negligence; specifically in charging the jury that it might find appellant negligent on all three grounds set forth by Barnes. Appellant urges that it was error to submit instructions to the jury on the issues of lack of control and improper lookout in the absence of substantial evidence tending to establish either theory. Appellant takes the position that the issue of excessive speed was the only ground upon which the jury might reasonably find appellant culpable. Hence, it argues that the trial judge committed reversible error in submitting to the jury the issues of improper control and improper lookout since the jury might have found appellant liable on either or both of these unsubstantiated grounds.

■ At the trial, Barnes introduced evidence that the engineer was required by railroad operating rules to "proceed prepared to stop short of train, obstruction, or anything that may require the speed of the train to be reduced" within the station or yard limits. Barnes contended that the engineer was acting in violation of this rule and that the violation might be considered by the jury as some evidence of both excessive speed and improper control. Barnes also elicited testimony that the engineer on prior occasions had driven the train through the Plymouth yard at a speed not exceeding 10 mph. The engineer customarily made a stop at Plymouth, however, and this reduced speed on prior occasions may have been attributable in large measure to his expectation to have to stop. Nonetheless, Barnes' position was that the engineer, in light of past experience, should also have expected an order to stop on the day of the accident and should have been operating the train under such control and at such speed as would have enabled him to gradually bring the train to a stop and obviate excessive slack action. We think Barnes was entitled to get to the jury on the issues of excessive speed and improper control.

■■ We also think the record contains sufficient evidence to permit him to get to the jury on the issue relating to improper lookout. The act of keeping a proper lookout includes not only the act of looking but also of observing and reacting properly and within a reasonable time to what one has observed. The testimony of the witnesses that the engineer failed to slow down until he had asked the brakeman to double check the fireman's report that the semaphore indicated stop; that the engineer twice blew his horn as a signal to the station house employees to check the semaphore; the testimony of the brakeman that the engineer did not start to stop until the train was within four or five car lengths of of the station; the testimony of the engineer that he applied 75% of the emergency pressure when he finally decided to take the stop signal seriously; and that the train did not finally come to a halt until it was well past the station— all these facts were as much subject to an inference that no proper lookout had been kept as that the train was traveling at an excessive speed to begin with. It is for the jury to draw inferences from the facts and "only when there is a complete absence of probative facts to support the conclusion reached does reversible error occur." Melville v. State of Maryland, 155 F.2d 440 (4 Cir. 1946). This court must take the evidence in the light most favorable to the appellee where a jury verdict supports his position. Atlantic Greyhound Corp. v. Eddins, 177 F.2d 954 (4 Cir. 1949).

■ Appellant urges several additional grounds for reversal. It finds error in the trial judge's permitting Barnes to introduce into evidence a handbook of rules and regulations promulgated by the railroad to govern the operation of trains. After permitting the introduction of six of these rules during the trial, alleged to have been violated by appellant's agents, and thus indicating some negligence on their part, the trial judge specifically instructed the jury to ignore the two which were alleged by appellant to have been prejudicial.

The first of these rules, 93-B, dealt with inferior trains and the trial judge instructed the jury to ignore its provisions, since the train involved in the present case was a dominant train. The trial judge also instructed the jury to ignore rule 93-D, limiting a train to "eight miles per hour moving through crossovers, turnouts, or passing tracks." This rule was inapplicable, as made clear by the trial judge in his instructions, because it was intended for the protection of third persons and not crew members. Crew members were entitled to the benefits of the remaining rules introduced, however, and the trial judge instructed the jury that their violation might be "a factor * * * to consider along with all the other factors in this case, as to whether or not the railroad failed to use due care." We think the trial judge made it perfectly clear in his instructions that the jury could not consider rules 93-B and 93-D. The others were pertinent and were properly admitted into evidence. Renaldi v. New York, N. H. & H. R. R., 230 F.2d 841, 59 A.L.R.2d 1371 (2 Cir. 1956); Dundom v. New York C. R. R., 145 F.2d 711 (2 Cir. 1944).

Appellant also objects to the exclusion of two writings written by company officials relating to Barnes' past safety record. The first of these was a letter written on February 12, 1959, by S. C. Cherry, appellant's vice president, to S. J. Massey, trainmaster, in which Cherry enumerated five previous accidents in which Barnes was involved and requested that Massey talk to him about these accidents. Cherry noted in his letter that Barnes "was spoiling an otherwise good record by the number of personal injuries being charged against him." Cherry wrote that he was of the opinion that each one had been due to Barnes' carelessness and that they established that he was "accident prone." Massey, in his reply on February 19, 1959, informed Cherry that he had discussed the latest accident, occurring on February 12, 1959, with Barnes and had specifically warned him of the hazard of slack action.

■ Massey was unavailable at the trial, being ill and out of the state, and appellant contends that these two writings should have been admitted under 28 U.S.C.A. § 1732[1], the federal "shop book" statute permitting the introduction of business records made in the regular course of that business. Appellant takes the view that both Cherry's letter and Massey's reply were made in the regular course of the railroad's business. We disagree. In our view, these writings do not meet three specific requirements of § 1732. To be admissible without authentication, writings must be made (1) "in [the] regular course of business," (2) "at the time of such act * * * or within a reasonable time thereafter," and (3) must be offered "as evidence of such act, transaction, occurrence, or event."

■ The Supreme Court foreclosed our considering these writings as made in the "regular course of business" in Palmer v. Hoffman, 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645 (1943). In Palmer, recorded statements made by a railroad engineer before company officials and a state commission relating to a grade crossing accident that occurred two days earlier was held to be inadmissible under § 1732's predecessor statute as not made in the regular course of business. Mr. Justice Douglas, writing for the Court, stated:

> "The business of the petitioners is the railroad business. That business like other enterprises entails the keeping of numerous books and records essential to its conduct or useful in its efficient operation.

Though such books and records were considered reliable and trustworthy for major decisions in the industrial and business world, their use in litigation was greatly circumscribed or hedged about by the hearsay rule —restrictions which greatly increased the time and cost of making the proof where those who made the records were numerous. 5 Wigmore, Evidence (3d ed., 1940) § 1530. It was that problem which started the movement towards adoption of legislation embodying the principles of the present Act. See Morgan et al, The Law of Evidence, Some Proposals for its Reform (1927) c.V. And the legislative history of the Act indicates the same purpose.

"The engineer's statement which was held inadmissible in this case falls into quite a different category. It is not a record made for the systematic conduct of the business as a business. An accident report may affect that business in the sense that it affords information on which the management may act. It is not, however, typical of entries made systematically or as a matter of routine to record events or occurrences, to reflect transactions with others, or to provide internal controls. The conduct of a business commonly entails the payment of tort claims incurred by the negligence of its employees. But the fact that a company makes a business out of recording its employees' versions of their accidents does not put those statements in the class of records made

---

1. § 1732(a) "In any court of the United States and in any court established by Act of Congress, any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence, or event, shall be admissible as evidence of such act, transaction, occurrence, or event, if made in regular course of any business, and if it was the regular course of such business to make such memorandum or record at the time of such act, transaction, oc-

currence, or event or within a reasonable time thereafter.

"All other circumstances of the making of such writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but such circumstances shall not affect its admissibility.

"The term 'business,' as used in this section, includes business, profession, occupation, and calling of every kind." 62 Stat. 945 (1948), as amended, 65 Stat. 206 (1951), 28 U.S.C.A. § 1732.

"in the regular course" of the business within the meaning of the Act.

Also missing here is the requirement that the writings be made at the time of the occurrence or within a reasonable time thereafter. Cherry's letter of February 12, 1959, summarized a number of accidents occurring over a nine year span of time, the first of which occurred as far back as 1950. Moreover, Cherry's letter and Massey's reply were communications passing some six months *prior* to the date of the accident with which we are here concerned. In light of these time discrepancies, we must hold that the concomitance required under § 1732 is absent in the present case.

Further, these writings were not introduced to establish the proposition that these prior accidents of Barnes had in fact taken place. Rather they were introduced in order to persuade the jury that because Barnes had a history of prior accidents with the railroad, the probabilities were high that he was contributorily negligent on the day of the accident. Such a purpose is not only contrary to the provisions of § 1732, but has been condemned by courts and commentators as unduly prejudicial to the party against whom the inference is to be drawn. See, e. g., MCCORMICK, EVIDENCE § 156 n. 4 (1954) and cases cited; 1 WIGMORE, EVIDENCE § 199 n. 1 (3d ed. 1940) and cases cited.

Our decisions in Kissinger v. Frankhouser, 308 F.2d 348 (4 Cir. 1962), and Thomas v. Hogan, 308 F.2d 355 (4 Cir. 1962), are not to the contrary to the views expressed above. In both cases we held that entries made on hospital records were admissible since diagnosis was held to be the regular business of hospital personnel. These records were offered as evidence tending to prove that two of the parties to the actions had been under the influence of alcohol immediately prior to their admittance to the hospitals. Thus, in addition to being made in the regular course of business, the records met the other two requirements of concomitance and proper purpose.

It should be pointed out that two judges dissented in Kissinger and Thomas on the ground that the hospital records embodied opinion evidence. The majority, nonetheless, felt that the records should be admissible because of the expertise and objectivity of the hospital personnel who made the entries. In the present case, on the other hand, the blatant element of opinion, epitomized by Cherry's view that Barnes was "accident prone," was unqualified by these saving factors.

Appellant next urges that the trial judge improperly permitted Barnes to prove his unemployment at the date of the trial as an element to be considered by the jury in assessing damages. In an attempt to escape liability for his continuing unemployment, appellant offered evidence that Barnes was rehired by the company subsequent to his injury, but had been thereafter suspended for cause. Appellant also offered evidence that it was prevented from again rehiring Barnes upon completion of the suspension because of his ineligibility under union seniority rules. Barnes, of course, maintained that the real reason for his suspension and appellant's refusal to rehire was his disability.

We think that Barnes' unemployment was a proper matter for jury consideration. Appellant was afforded full opportunity to explain its version of the reasons involved in Barnes' suspension and continuing unemployment. The jury was free to believe appellant's or Barnes' version, but we think the choice was properly theirs.

Finally, appellant makes general and unsupported allegations that Barnes' counsel improperly argued that this case was analogous to a workmen's compensation case, i. e., that proof of appellant's negligence was not a prerequisite to Barnes' recovery. Appellant also contends that counsel for Barnes improperly argued before the jury that railroad employees must testify favorably for the railroad in order to retain their jobs. The argument of Barnes' counsel on the two points is not reported in the record.

Moreover, the trial judge, upon objection of appellant on the first point, stated that it was his understanding that workmen's compensation was *not* argued by Barnes' counsel. As to the second, the trial judge instructed counsel for Barnes to go no further into the bias question. In the face of the clarification and instructions from the bench we feel unwarranted in finding error on the last two points.

We have also examined Barnes' cross appeal and find it to be without merit.

The judgment is therefore affirmed.