PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

INTERNATIONAL GROUND
TRANSPORTATION, INCORPORATED, t/a
White's Taxi Service, Incorporated,
t/a White's International Taxi,
                    *Plaintiff-Appellant,*

            v.

MAYOR AND CITY COUNCIL OF OCEAN
CITY, MARYLAND, a Maryland
Municipal Corporation; JAMES N.
MATHIAS, JR.; BERNADETTE DIPINO;
JAMES S. HALL, Member of Ocean
City Police Commission; JOSEPH T.
HALL, II,
                    *Defendants-Appellees.*

No. 05-1827

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
William D. Quarles, Jr., District Judge.
(CA-04-248-WDQ)

Argued: October 27, 2006

Decided: January 22, 2007

Before NIEMEYER, TRAXLER, and SHEDD, Circuit Judges.

---

Affirmed in part and reversed in part by published opinion. Judge
Shedd wrote the opinion, in which Judge Traxler concurred except as
to Part II(A). Judge Traxler wrote an opinion concurring in part and
concurring in the judgment. Judge Niemeyer wrote an opinion concurring in the judgment in part and dissenting in part.

**COUNSEL**

**ARGUED:** Francis Raymond Laws, THOMAS & LIBOWITZ, P.A., Baltimore, Maryland, for Appellant. Bruce Frederick Bright, AYRES, JENKINS, GORDY & ALMAND, P.A., Ocean City, Maryland, for Appellees. **ON BRIEF:** Patrick J. Madigan, THOMAS & LIBOWITZ, P.A., Baltimore, Maryland, for Appellant. Guy R. Ayres, III, AYRES, JENKINS, GORDY & ALMAND, P.A., Ocean City, Maryland, for Appellees.

---

**OPINION**

SHEDD, Circuit Judge:

International Ground Transportation, Inc. ("IGT")[1] brought this action under 42 U.S.C. § 1983 against the Mayor and City Council of Ocean City, Maryland ("the City"), and against individual officials of Ocean City ("the individual defendants"), seeking recovery for damages to its taxicab business incurred as a result of alleged unconstitutional acts by the City and the individual defendants. A jury returned a verdict in favor of IGT against the City and awarded $250,000 in compensatory damages; however, the jury found the individual defendants not liable. The City then moved for judgment as a matter of law, arguing that a finding of no liability on the part of the individual defendants precluded a finding that the City was liable and that IGT failed to prove damages with sufficient particularity to support the jury's damages award. IGT also moved for judgment as a matter of law, contending that the evidence established that the individual defendants were liable as a matter of law. Without explanation, the district court granted the City's motion and denied IGT's motion, and IGT now appeals. For the reasons set forth below, we affirm in part and reverse in part.

---

[1]IGT also operates under the trade name of "White's Taxi."

I

IGT is a taxicab company that formerly operated in Ocean City.[2] After opening in May 2002, IGT saw a steady increase in business and revenue from advertisements in its vehicles, a voucher system with a local hospital, and a promotional program driving patrons from bars. By April 2003, IGT had grown from 14 to 60 taxicabs and was the largest taxicab company in Ocean City.

To operate in Ocean City, a taxicab must pass two inspections. First, the vehicle must be inspected by a station licensed by the Automotive Safety Enforcement Division of the Maryland State Police. After receiving an inspection certificate from the station, the taxicab must be inspected by the Ocean City Police Department ("OCPD"). After the vehicle passes both inspections, OCPD issues an inspection certification decal which must be displayed in the rear window of the taxicab. Inspection certification decals expire on April 30 of each year.

In April 2003, OCPD scheduled inspection for IGT's fleet of taxicabs, each of which had been inspected at state inspection stations at a prior time. Shortly before the date of the OCPD inspection, however, OCPD notified IGT that the OCPD inspection must occur within 90 days of the state inspection. Because many of its vehicles had undergone their state inspection more than 90 days before the scheduled OCPD inspection, IGT was forced to act quickly to have the taxicabs reinspected at state stations. Unable to locate a station that could handle the volume of inspections in the immediate area, IGT had many of its taxicabs inspected at Oliver's Automotive ("Oliver's"), an inspection station in Waldorf, Maryland. The taxicabs were then taken to OCPD, where they passed inspection and received inspection certification decals.

Shortly thereafter, OCPD instructed IGT to bring several of its vehicles to the OCPD station. Upon arrival, two Maryland state troop-

---

[2]Because the district court granted judgment as a matter of law, we must view the facts — and we recite them here — in a light most favorable to IGT (the non-moving party). *Anderson v. Russell*, 247 F.3d 125, 129 (4th Cir. 2001).

ers inspected IGT's taxicabs, apparently as part of an investigation into Oliver's. After inspecting several of IGT's taxicabs, the state troopers issued three safety equipment repair orders. All of IGT's licensed vehicles remained in operation.

On May 21, 2003, IGT received a letter from OCPD bearing the signature of OCPD Chief Bernadette DiPino. This letter advised IGT that "every vehicle you are currently operating in Ocean City is suspended and is to be removed from service until such time as you have each vehicle re-inspected by a certified inspection station." J.A. 799. OCPD issued the letter to IGT after receiving information from the state troopers who were investigating Oliver's. The state troopers informed OCPD that they doubted the sufficiency of the inspections at Oliver's and that any vehicles inspected there may be unsafe. The troopers further informed OCPD that, of the six IGT taxicabs they had inspected, five had "obvious defects" with respect to the suspension, exhaust system, emissions, mirrors, seatbelts, steering, brakes, wipers, and/or tires. J.A. 801. The troopers noted that

> [a]ll of the defects, with the exception of the Tire [*sic*], appeared to have been on the cabs for quite some time, and would have certainly been present at the time they were State Inspected [at Oliver's]. Four of the vehicles with defects were State Inspected at Oliver's Automotive . . . . Based on the quantity of defects found on a random sampling of cabs inspected, there is a strong possibility that many more cabs would also have defects still existing. All of the defects found were obvious in nature and found without the use of inspection tools.

*Id.*

On June 5, 2003, DiPino issued a letter inviting IGT to the next regularly scheduled Police Commission meeting, set for June 11, 2003, "in an effort to resolve [its] licensing issue." J.A. 803. The owners of IGT, Brian and Teresa Hamilton, attended the meeting along with their counsel. The purpose of the meeting, however, was not to provide a forum in which IGT could challenge the suspension of its taxicab licenses through the presentation of argument and evidence. At the meeting, OCPD officer Hugh Bean reported on IGT's failure

to pass some vehicle inspections and that IGT's taxicabs had been temporarily de-licensed pending reinspection.

IGT subsequently brought suit against the City and the individual defendants: DiPino, Mayor James N. Mathias, and Police Commission members James S. Hall and Joseph T. Hall. IGT alleged that the City and the individual defendants acted unilaterally to revoke their taxicab licenses without following the provisions of the United States Constitution and Maryland state law. Specifically, IGT alleged that the City and the individual defendants violated its rights to procedural and substantive due process, equal protection, the ability to engage in interstate commerce, and various Maryland state constitutional provisions. IGT sought actual and punitive damages, contending that its business was decimated by the revocation of its taxicab licenses, especially as the suspension of its taxicab fleet occurred shortly before the busy Memorial Day weekend. IGT alleged that its voucher revenue decreased from as much as $6,000 per month to $1,000 per month, that it lost advertising revenue of $250,000 per year, that its business went from a value of $4 million to become defunct, and that it was faced with over $2 million in total debt.

The City and the individual defendants denied many of the allegations made by IGT and asserted numerous defenses. The defendants' principal argument was that they had acted in an emergency situation to remove IGT's unsafe taxicabs from the streets of Ocean City. They maintained that the emergency nature of the threat presented by IGT's vehicles justified a de-licensing of the taxicabs without a pre-deprivation hearing. They also asserted a defense of qualified immunity.

The case was tried to a jury. At the close of evidence, the defendants moved for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(a). The district court granted the motion as to IGT's claims for punitive damages on the state-law violations but denied the motion in all other respects. The court instructed the jury extensively on the constitutional issues involved in the case and specifically charged the jury that it could find the individual defendants not liable based on qualified immunity. The jury returned a verdict in favor of IGT against the City but returned a verdict in favor of the individual defendants. More specifically, the jury answered "No" when asked whether

the individual defendants "deprived White's Taxi of procedural due process . . . substantive due process . . . equal protection . . . [or] its ability to engage in interstate commerce." J.A. 826-27. The jury then answered "Yes" when asked whether the City "deprived White's Taxi of procedural due process [or] substantive due process." J.A. 827. Finally, the jury awarded IGT $250,000 in actual damages.

Following the verdict, both parties moved for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b). IGT maintained that the evidence presented at trial established as a matter of law that the individual defendants had deprived it of its rights to procedural and substantive due process and that they had not established a qualified immunity defense. The City opposed IGT's motion and argued instead that it was entitled to judgment as a matter of law. The City presented two grounds in support of its motion: (1) the jury's finding that the individual defendants were not liable precluded a finding of liability on the part of the City, and (2) IGT had failed to present evidence establishing its entitlement to damages. The district court, without issuing an opinion, granted the City's motion and denied IGT's motion. This appeal followed.

II

We review de novo the grant or denial of a motion for judgment as a matter of law. *Anderson*, 247 F.3d at 129. Judgment as a matter of law is proper when the court determines that "there is no legally sufficient evidentiary basis" for a reasonable jury to find for the non-moving party. Fed. R. Civ. P. 50(a). When a jury verdict has been returned, judgment as a matter of law may be granted only if, viewing the evidence in a light most favorable to the non-moving party (and in support of the jury's verdict) and drawing every legitimate inference in that party's favor, the only conclusion a reasonable jury could have reached is one in favor of the moving party. *Figg v. Schroeder*, 312 F.3d 625, 635 (4th Cir. 2002).

IGT contends that the district court erred in granting the City's motion for judgment as a matter of law. The district court did not explain its reasons for granting the motion but instead simply ordered that the motion be granted. Because the City set forth two grounds in

support of its motion, we must examine each to ascertain whether the district court's order can stand.

## A.

The City first asserts that it is entitled to judgment as a matter of law because a finding that the individual defendants were not liable precludes a finding that the City is liable. We disagree.

In support of its position that it cannot be held liable, the City relies primarily on *City of Los Angeles v. Heller*, 475 U.S. 796 (1986), and *Grayson v. Peed*, 195 F.3d 692 (4th Cir. 1999). In *Heller*, the Supreme Court held that a municipality may not be found liable for a constitutional violation in the absence of an unconstitutional act on the part of at least one individual municipal actor. 475 U.S. at 798-99. We reaffirmed this principle in *Grayson* and have applied it many times in the context of § 1983 actions.

Nevertheless, we recognize that, despite the general bar to municipal liability set out in *Heller*, a situation may arise in which a finding of no liability on the part of the individual municipal actors can co-exist with a finding of liability on the part of the municipality. Namely, such a verdict could result when the individual defendants successfully assert a qualified immunity defense. This case presents exactly this situation.

While individual defendants are protected by qualified immunity, municipalities are not. *Owen v. City of Independence*, 445 U.S. 622 (1980). This distinction has an important ramification on liability: *i.e.*, even when a constitutional violation has been committed, individual defendants may escape liability based on a qualified immunity defense. *See Robles v. Prince George's County*, 302 F.3d 262 (4th Cir. 2002) (finding constitutional violation but immunity for individual defendants). However, because municipalities are not entitled to assert a qualified immunity defense, a finding of a constitutional violation is conclusive as to their liability. Thus, a jury could find that a constitutional violation has occurred but that the individual defendants are entitled to qualified immunity. Yet the jury could also return a verdict against a municipality based on the same constitutional violation. As other circuits have found, "If the jury based its verdict on

the ground that the officers were entitled to qualified immunity, the *Heller* rule precluding liability is inapplicable." *Myers v. Oklahoma County Bd. of County Com'rs.*, 151 F.3d 1313, 1317 (10th Cir. 1998); *see also, e.g., Barber v. City of Salem*, 953 F.2d 232, 237-38 (6th Cir. 1992). In this situation, there is no "inherent inconsistency" in the jury's verdict. *Myers*, 151 F.3d at 1317. Indeed, the Supreme Court implicitly recognized this possibility in *Heller* when it noted that the fact that the *Heller* jury was not charged on a qualified immunity defense ruled out the possibility of liability on the part of the munici-pality once the individual defendants were found not liable. 475 U.S. at 797-98. We hold, therefore, that when a jury, which has been instructed on a qualified immunity defense as to the individual defen-dants, returns a general verdict in favor of the individual defendants but against the municipality, the verdict is consistent and liability will lie against the municipality (assuming the verdict is proper in all other respects).[3]

In this case, the verdict form shows that the jury found that the City deprived IGT of procedural and substantive due process but that the individual defendants did not. The City argues that these findings trig-ger application of the *Heller* rule and require that judgment as a mat-ter of law be entered in its favor. However, the jury was instructed that it could find the individual defendants not liable based on quali-fied immunity. Thus, the jury could have found that constitutional violations were committed but that the individual defendants were entitled to immunity. Indeed, this is the only way the jury's verdict may be read consistently, and we must "harmonize seemingly incon-sistent verdicts if there is any reasonable way to do so." *Atlas Food*

---

[3]We do not intend our holding here to approve the submission of quali-fied immunity to juries. Entitlement to qualified immunity is a legal question to be decided to the court, although factual issues underlying the qualified immunity analysis may be submitted to a jury. *Willingham v. Crooke*, 412 F.3d 553, 558-59 (4th Cir. 2005). This being the case, "the district court should submit factual questions to the jury and reserve for itself the legal question of whether the defendant is entitled to qualified immunity on the facts found by the jury." *Id.* at 560. Nonetheless, we find it necessary to hold as we do here because the parties do not main-tain that the district court erred in submitting qualified immunity to the jury.

*Systems and Services, Inc. v. Crane Nat. Vendors, Inc.*, 99 F.3d 587, 599 (4th Cir. 1996).

For this same reason, we cannot accept the City's argument that the precise language of the verdict form necessitates a finding of no liability on the part of the City. Although it is true that the questions asked whether the jury found that the individual defendants, *e.g.*, "deprived White's Taxi of procedural due process" and not simply whether the individual defendants were liable, we find the distinction made meaningless by the submission of qualified immunity to the jury. The jury was specifically instructed that it could find the individual defendants not liable based on qualified immunity. However, the verdict form submitted to the jury allowed the jury to find that the individual defendants committed constitutional violations but were entitled to qualified immunity only by checking the "No" answers to the questions asked regarding the individual defendants (*e.g.* "Do you find that the following persons deprived White's Taxi of procedural due process?"). The City, in fact, conceded at oral argument that there was no way for the jury to find that qualified immunity applied except by answering "No" to the questions asking whether the individual defendants had committed constitutional violations. Moreover, because the jury made specific findings that the City had committed constitutional violations, the only way to read the jury's verdict consistently is to read the questions asked of the individual defendants as encompassing qualified immunity. As we are required "to determine whether a jury verdict can be sustained, on any reasonable theory," *id.*, we must conclude that the language of the verdict form permitted the jury to find that the individual defendants committed constitutional violations but were entitled to qualified immunity.

Finally, the City contends that even if the jury found that constitutional violations were committed but that the individual defendants were not liable by virtue of qualified immunity it cannot be held liable because the doctrine of respondeat superior does not apply to claims under § 1983. The City misunderstands IGT's theory of liability. In its complaint, IGT alleged direct liability against the City under § 1983, asserting that officials with final policymaking authority acted to deprive IGT of its constitutional rights. *See* J.A. 21-22, 24. As such, IGT alleged that the City itself — acting through its policymaking officials — was liable. This is a viable theory of liability, *see*

*Monell v. Dept. of Social Services*, 436 U.S. 658, 694 (1978) ("[W]hen execution of a government's policy . . . whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy . . . inflicts the injury . . . the government as an entity is responsible under § 1983"), and it is adequately supported by evidence in the record. DiPino, for example, testified that she possesses authority to promulgate rules and regulations governing taxicabs in Ocean City, and she further stated that the Police Commission is an arm of the City composed of several members of the city council plus the mayor. The jury was free to use this testimony to find the City liable, having been instructed that it must determine whether the individual defendants acted in "their individual capacity or in their capacity as officials of Ocean City." J.A. 605. Thus, the absence of respondeat superior on IGT's federal claims does not render the jury's verdict unsound.[4]

Accordingly, the City is not entitled to judgment as a matter of law based on *Heller* or on any alleged inconsistency in the verdict.

B.

The City next maintains that it should be awarded judgment as a matter of law because IGT failed to present evidence from which the jury could reasonably infer any injury proximately caused by the defendants' conduct or from which the jury could reasonably calculate any award of compensatory damages. We find the City's argument unpersuasive.

In contending that the evidence presented at trial does not support the jury's award of compensatory damages, the City faces a "hefty

---

[4]Of course, based on the wording of the verdict form, the jury also could have found that the City violated IGT's due process rights under Maryland state law. Even so, the verdict would withstand scrutiny based on our analysis of qualified immunity and direct liability. Alternatively, because Maryland law holds municipalities vicariously liable for the torts of their employees, *Serio v. Baltimore County*, 863 A.2d 952, 966 (Md. 2004), the verdict could also be upheld on the theory that the jury found that a city employee not named as a defendant (such as Captain Parker) violated IGT's rights under Maryland law.

burden." *Price v. City of Charlotte*, 93 F.3d 1241, 1249 (4th Cir. 1996). This is so because in determining whether the evidence supports a jury award, we review the evidence, and all reasonable inferences to be drawn therefrom, in favor of the non-moving party. *Id.* at 1249-50. Recognizing that we may not substitute our judgment for that of the jury or make credibility determinations, we will affirm if there is evidence in the record on which a reasonable jury may return a verdict in favor of the non-moving party. *Id.*; *see also Duke v. Uniroyal, Inc.*, 928 F.2d 1413, 1417 (4th Cir. 1991) ("If . . . a reasonable jury could return a verdict in favor of [the] plaintiffs, the court must defer to the judgment of the jury even if the court's judgment on the evidence differs.").

The record in this case contains ample evidence from which the jury could have found actual injuries to IGT caused by the City and the individual defendants. For example, Brian Hamilton testified that IGT was worth approximately $4 million prior to the City's revocation of its taxicab licenses and that it went out of business afterward. Further, the jury heard that IGT had incurred $2 million in debt, $5,565 in re-inspection costs, and $425,000 it used to purchase other taxicabs. In addition, Hamilton's testimony indicated that IGT lost $4,500 per month in voucher revenues and $250,000 in annual general advertising revenues. Finally, Hamilton stated that all of these losses occurred after the City's revocation of IGT's taxicab licenses just prior to the extremely busy Memorial Day weekend.

We believe Hamilton's testimony and the other evidence presented by IGT (*e.g.*, asset purchase agreements and tax returns) constitutes substantial evidence which supports the jury's award of $250,000 in compensatory damages. *See Barnes v. Norfolk Southern Ry. Co.*, 333 F.2d 192, 195 (4th Cir. 1964) ("Only where there is a complete absence of probative facts to support the conclusion reached does a reversible error appear."). Whether IGT's evidence in support of damages lacks credibility — as the City asserts — is a determination that was within the province of the jury. Therefore, the verdict does not fail due to lack of damages.[5]

---

[5]Because IGT would be entitled to nominal damages under § 1983 and under Maryland law, the City could not be awarded judgment as a matter

C.

In sum, although the district court did not specify its rationale for granting judgment as a matter of law to the City, we have examined the two possible bases upon which it could have relied. We find that neither supports the City's argument that the jury's verdict is legally unsound and that it is entitled to judgment as a matter of law. Accordingly, the district court erred when it granted the City's motion.[6]

III

Based on the foregoing, we affirm the denial of IGT's motion for judgment as a matter of law against the individual defendants but reverse the entry of judgment as a matter of law in favor of the City.

*AFFIRMED IN PART AND REVERSED IN PART*

TRAXLER, Circuit Judge, concurring in part and concurring in the judgment:

I concur in Parts I, II(B), II(C), and III, and in the result reached in Part II(A). Because I look at the issues somewhat differently, I write separately to explain my views.

I.

To fully appreciate the jury's decisions in this case, we must exam-

---

of law even had IGT failed to prove actual damages. *Randall v. Prince George's County*, 302 F.3d 188, 208 (4th Cir. 2002) (noting the availability of nominal damages under Maryland Declaration of Rights); *Gray v. Spillman*, 925 F.2d 90, 93 (4th Cir. 1991) ("Having proven the constitutional violation . . . § 1983 requires nothing more to establish the defendants' liability.").

[6]IGT contends that the district court erred not only in granting the City's motion for judgment as a matter of law but also in denying IGT's own motion for judgment as a matter of law against the individual defendants. We have reviewed the record and find the denial of IGT's motion to be proper.

ine the verdict form and the jury charges.* This jury was asked to report its verdict through answers to specific questions pursuant to Federal Rule of Civil Procedure 49(a). This Rule permits the district court to submit various questions to the jury in lieu of a general verdict and gives the court wide discretion in fashioning appropriate inquiries. The following questions, at issue in this appeal, were submitted:

INDIVIDUAL DEFENDANTS

Please answer "Yes" or "No" with respect to each person.

1.   Do you find that the following persons deprived White's Taxi of procedural due process?

| | | | |
|---|---|---|---|
| Chief Bernadette DiPino | Yes ____ | No | X |
| James N. Mathias, Jr. | Yes ____ | No | X |
| James Hall | Yes ____ | No | X |
| Joseph T. Hall | Yes ____ | No | X |

2.   Do you find that the following persons deprived White's Taxi of substantive due process?

| | | | |
|---|---|---|---|
| Chief Bernadette DiPino | Yes ____ | No | X |
| James N. Mathias, Jr. | Yes ____ | No | X |
| James Hall | Yes ____ | No | X |
| Joseph T. Hall | Yes ____ | No | X |

\* \* \*

MAYOR AND CITY COUNCIL OF OCEAN CITY

5.   Do you find that Ocean City deprived White's Taxi of procedural due process?

---

*This case is made more difficult by the unusual way the jury charge was structured and by the way the verdict form was configured. Since no appeal is taken as to the charge and no objection was made to the relevant portions of the verdict form, I express no opinion on the validity of either.

Yes  X

No  ____

6.  Do you find that Ocean City deprived White's Taxi of substantive due process?

Yes  X

No  ____

J.A. 826.

The jury's finding of no liability on the part of city officials and its finding of liability on the part of the City itself seem, at first blush, to be inconsistent. In such a situation courts must examine the record to see if there is a legitimate way to reconcile the decisions made by the jury. The Supreme Court has told us: "Where there is a view of the case that makes the jury's answers to special interrogatories consistent, they must be resolved that way." *Atl. & Gulf Stevedores, Inc., v. Ellerman Lines, Ltd.*, 369 U.S. 355, 364 (1962). Thus, "[w]hen the use of a special verdict form leads to apparently conflicting jury findings, the court has a duty under the seventh amendment to harmonize the answers, if it is possible to do so under a fair reading of them." *Gosnell v. Sea-land Serv., Inc.*, 782 F.2d 464, 466 (4th Cir. 1986). In our efforts to reconcile the verdicts, we "must view the evidence in the light most favorable to upholding the jury's decision by a finding of consistency." *Ellis v. Weasler Eng'g Inc.*, 258 F.3d 326, 343 (5th Cir. 2001). In examining the jury's answers, we must be mindful that a jury can take its own view of the evidence presented to it, regardless of the theories argued by the parties, so long as the jury's view is supported by the evidence and is consistent with the law as charged.

II.

A.

The first possible reading of the verdict is that the jury found that there were no constitutional violations by any of the individual defendants. If that is the case, the question then would be how the jury could find that none of the named individual defendants committed

any constitutional violations themselves, but still find the City itself liable for depriving White's Taxi of procedural and substantive due process.

One possible explanation concerns an individual who was not sued and on whose actions the jury was not called upon to pass judgment. Captain Parker was a police officer with the Ocean City Police Department and head of the patrol division which had control over the traffic safety unit. Captain Parker was neither named as a defendant nor called to testify. However, Bernadette DiPino, the Chief of Police of Ocean City, testified that she was out of the office and Parker was in charge when the shut-down letter was sent to White's Taxi. According to Chief DiPino, it was Captain Parker who composed and sent the shut-down letter. Although Chief DiPino said she was generally aware that action was going to be taken, she did not specifically remember being told about the letter before it went out and she did not sign it. Officer Ronnie Townsend testified that he remembered Chief DiPino being out that day and that Captain Parker was acting as Chief.

Under these circumstances, the jury could logically find that Captain Parker was the person who took the action that led to the closing of White's Taxi and that he was responsible for the denial of procedural due process. Such a finding would explain why the jury decided that none of the individual defendants named in the complaint (DiPino, Mathias, Hall and Hall) were liable for this claim. Since Captain Parker was not sued, his name was not on the verdict form, and the jury had no place to report its belief that he was the one responsible. This would explain how the jury could find a police officer of Ocean City responsible for a violation of procedural due process and still give a verdict in favor of DiPino, Mathias, James Hall, and Joseph Hall.

The question that follows is how this view of the evidence and the verdict could translate into liability for the City. To answer that question, we must examine what theories of liability against the City were charged to the jury.

White's Taxi brought federal claims and state law claims against Ocean City. The federal law claims were based on the due process

clause, the equal protection clause, and the interstate commerce clause of the United States Constitution. The state law claims were based on the Maryland Constitution, and more specifically on its Declaration of Rights. The rights and protections that exist under procedural and substantive components of the due process clause of the United States Constitution also exist under the Maryland Constitution.

Under federal law, municipalities cannot be held liable under principles of respondeat superior for the actions of their employees. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). Instead, a municipality may be held liable under § 1983 only if it causes a deprivation of a constitutional right through an official policy or custom. *See Board of the County Comm'rs v. Brown*, 520 U.S. 397, 403 (1997).

Maryland law, however, does provide for municipal liability under the doctrine of respondeat superior if an employee has committed a violation of Maryland's constitutional rights in the performance of his job, *see Branch v. McGeeney*, 718 A.2d 631, 639 (Md. Ct. Spec. App. 1998), and the district court so charged the jury. Thus, if the jury concluded that Captain Parker was the real culprit in the denial of procedural due process, it would be permissible under Maryland law for the jury to impose liability on the City even while exonerating all of the named defendants. *Cf. Southern Mgmt. Corp. v. Taha*, 769 A.2d 962, 976-78 (Md. Ct. Spec. App. 2001) (explaining that the jury's exoneration of the employees named as defendants would not invalidate verdict against employer if there was evidence that an employee who was not named as a defendant committed the tort alleged by the plaintiff), *vacated on jurisdictional grounds*, 790 A.2d 11 (Md. 2002). This view, which is supported by the evidence and the law as charged to the jury, renders the verdicts consistent as to the procedural due process claim and requires that the verdict against the City be sustained.

The jury's decision as to a substantive due process violation against the City is also sustainable based on the judge's charge. Liability for the City would have been present under federal law on a finding by the jury that the sham hearing before the Police Commission was, as the court charged, "the direct result of Ocean City's ordinance, regulation, decision, policy or custom." J.A. 607.

### B.

The second possible reading of the verdicts is similar to that advanced by Judge Shedd. That is, the jury believed the individual defendants violated the constitutional rights of White's Taxi, but found that the individual defendants were protected by qualified immunity. Under the district court's charge such findings would make the City liable under Maryland law pursuant to principles of respondeat superior since there was no dispute that all of the city officials was acting within the scope of their employment. *See Town of Port Deposit v. Petetit*, 688 A.2d 54, 65 (Md. Ct. Spec. App. 1997).

### III.

The City resists this result, urging that the district court was correct to grant it a judgment as a matter of law. Its view is basically that the jury found no individual violated any constitutional rights and if no one committed a violation, then the City cannot be liable. Thus, the City concludes the district court was in effect compelled to direct entry of judgment for the City regardless of the verdict. There are several things wrong with this argument. First, we have two sets of verdicts—one against the City and one in favor of the individual defendants. The premise of the City's argument is that the verdict in favor of the individuals was the one correctly found by the jury, and therefore the verdict against the City was the jury's mistake. But the argument can just as easily be made by White's Taxi that the verdict against the City was the one correctly found by the jury, and therefore the verdict in favor of the individual defendants was the jury's mistake. In truth, we have no way of knowing which verdict controls so we treat the two verdicts as potential inconsistencies and approach the problem from that perspective. And second, for the reasons discussed above, I do not believe the jury's verdicts are inconsistent.

The City also contends that the *City of Los Angeles v. Heller*, 475 U.S. 796 (1986), and *Grayson v. Peed*, 195 F.3d 692 (4th Cir. 1999), obligated the district court to grant the motion for judgment as a matter of law. I find those cases inapposite.

In *Heller*, the Supreme Court considered a situation where a lawsuit against an individual officer and a municipality was bifurcated for

trial, with the claims against the officer being tried first. When the jury found the officer had committed no constitutional violation, the Supreme Court held that as a matter of law there could be no liability on the municipality which was "sued only because [it was] thought legally responsible for [the officer's] actions." *Heller*, 475 U.S. at 799. The facts of *Grayson* are similar—because there was no constitutional violation by the individual defendant, the municipality could not be held liable. *See Grayson*, 195 F.3d at 697.

*Heller* does not stand for the broad proposition that where municipal employees and the municipality are sued together a finding of individual liability is necessary to a finding of municipal liability. As stated by the Eighth Circuit,

> The appropriate question under *Heller* is whether a verdict or decision exonerating the individual governmental actors can be harmonized with a concomitant verdict or decision imposing liability on the municipal entity. The outcome of the inquiry depends on the nature of the constitutional violation alleged, the theory of municipal liability asserted by the plaintiff, and the defenses set forth by the individual actors.

*Speer v. City of Wynne*, 276 F.3d 980, 986 (8th Cir. 2002).

*Heller* and *Grayson* do not control in this situation because in those cases the liability of the municipalities under federal law was patently dependent on their officers having committed a constitutional violation. Upon a finding that the officer had committed no wrongdoing, the municipality was exonerated. Here, as to the due process claims, municipal liability could have been found in one of two ways. Either the jury could have decided that an employee did commit a constitutional violation for which the City could be held liable under Maryland law, or the jury could have found a basis for municipal liability under federal law that did not require a finding of individual liability by any particular employee.

While this jury's rationale was admittedly murky, a number of legitimate explanations for the jury's decisions can be found. In such a situation the law is clear as to what courts must do—we should reach a reconciliation if it can reasonably be done. I believe that it is

possible to reconcile the verdicts, as outlined above. Accordingly, I would also reverse the district court's grant of judgment as a matter of law.

NIEMEYER, Circuit Judge, concurring in the judgment in part and dissenting in part:

I concur in the judgment insofar as it affirms the district court's order denying plaintiff's motion for judgment as a matter of law against the individual defendants.

I also concur in the judgment insofar as it reverses the district court's order granting Ocean City's motion for judgment as a matter of law on liability. In so concurring, I agree that our task is to attempt to harmonize the apparently inconsistent verdicts if there is a logical way to do so. Both Judge Shedd and Judge Traxler provide plausible explanations by which the apparently inconsistent verdicts can be harmonized.

Finally, I dissent from the judgment insofar as it upholds the jury's verdict on damages because the damages portion of the verdict was unsupported by the evidence at trial. As I show herein, no reasonable jury could have concluded, based on the evidence in the record, that IGT sustained $250,000 in damages as a result of Ocean City's conduct. *See Price v. City of Charlotte*, 93 F.3d 1241, 1249 (4th Cir. 1996).

A closer reading of the record reveals that the numbers relied on by the majority to affirm the damages verdict were crude numbers tossed around by Brian Hamilton, the owner of IGT, as estimates, feelings, and "should-be's" about the amount of his company's losses, without any accounting for expenses or giving attention to the traditional requirements of valuing a business. There was no evidence that actually *proved* any damages caused by the temporary suspension of IGT's business license.

*First* with respect to the drop in IGT's voucher business from $6,000 per month to $1,000 per month that the majority opinion refers to, Brian Hamilton testified:

A.  I seen, you know — again, I don't have the exact numbers. But if it was $5,000 a month in vouchers, I seen our vouchers drop down to maybe a thousand a month.

Q.  And that continued through all of 2003 and into 2004?

A.  Into 2004, right.

Testifying further with respect to vouchers, first those from the Board of Education and then all vouchers in the aggregate, Brian Hamilton stated:

Q.  Approximately how much were you doing on a monthly basis in that work prior to May 21, 2003?

A.  I don't know. I mean total vouchers, like I said, total vouchers . . . there might have been five or $6000 a month between them all.

* * *

I mean during the school season, a lot of times we did more with the Board of Education, and some months could be higher. I mean I'm saying five or six. It could be eight one month and three the next. But on the average, I would say five or $6,000.

Q.  And that dropped down to about a thousand?

A.  Yes.

Yet, for *every month* from its beginning until its license was suspended, IGT lost money, losing $281,000 in the aggregate. There was no prognosis, forecast, or pro forma introduced at trial that showed that IGT could or would make a profit at any time in the future. As Brian Hamilton testified:

Q.  Okay. That company, based on its P and L, had negative income for the months from October 2002 through April of 2003, correct?

A.   That's correct, but you're not looking at the deprecia-
tion and the actual expenses that were put into doing
this. It's not just, it's not just your ongoing day-to-day
operation. I mean there was a lot put in up front.

Phones, we had $1,500 phones that were bought to put
in hotels all around the City. That's up-front cost that
was booked and expensed out at one time. That phone
would have been there for five years, ten years.

Q.   But the net income each month from November, from
October 2002 through April 2003 was a negative num-
ber, correct?

A.   Correct. But it's going to show a negative number if
you're —

* * *

Q.   And the net income is minus, net taxable income is
minus $281,000, correct?

A.   Yes.

Hamilton never advanced a theory of reliance damages or sought to
demonstrate that a reduction in vouchers increased the company's
losses for any given month. Rather, the record simply shows a contin-
uum of monthly losses beginning *months before* IGT's license was
suspended.

*Second*, with respect to the loss of $250,000 in advertising revenue
referred to by the majority opinion, Brian Hamilton testified:

Q.   With respect to the advertising revenues that the cab
company was experiencing to May the 21st of 2003,
can you tell us what that was either on an annual basis,
monthly basis?

A.   Well, what we had in contract was probably 50 to
$75,000 under contract annual. But, you know, based

on the amount of cabs that we had, with the advertising
we should have had, it should have generated about
$250,000 a year.

Thus, Hamilton did not testify to losing $250,000 per year. He said
"we *should have* had" that amount. The only hard number he gave
was that IGT had an existing *annual* contract paying $50,000 to
$75,000, and he did not testify that that contract came to an end or
ever stopped yielding income.

*Finally*, the majority opinion refers to testimony that IGT was
worth approximately $4 million prior to Ocean City's revocation of
IGT's taxicab licenses. This statement again was no more than a num-
ber pulled from the sky by Brian Hamilton. As Hamilton testified:

> Q. Mr. Hamilton, as of May 2003, what value did White's
> taxi, International Ground Transportation have as a
> company?
>
> * * *
>
> A. Like I said, the debt was $2 million, and based on the
> cash flow projections that we had on actual numbers,
> I would say the company was worth $4 million.
>
> * * *
>
> A. I'm saying based on cash flow projections. You're ask-
> ing me what do I feel the company was worth based on
> historic numbers that were from White's and Sunshine
> and Delmarva and International combined. That's what
> I would say it was worth. If you're asking me that,
> that's what I would say.
>
> * * *
>
> Q. But the net income each month from November, from
> October 2002 through April 2003 was a negative num-
> ber, correct?

A.  Correct.

*  *  *

Q.  And the net income is minus, net taxable income is minus $281,000, correct?

A.  Yes.

Q.  But your testimony is by May of 2003, this Company is worth $4 million.

A.  Yes, it is.

Q.  You had $2 million in debt in relation to this company?

A.  Right now that's what I have, yes.

Q.  What did you pay for the assets of Weimer, Inc.?

A.  $350,000.

Q.  You paid $350,000 for the assets of Weimer, Inc. and those were the bulk of the assets for what became International Ground Transportation, correct?

A.  No. The big asset of Weimer, Inc. was, really, the major asset I got was a phone number. I threw half the cars away.

*  *  *

Q.  Well, wasn't there a value ascribed to the vehicles in the purchase agreement?

A.  No, not that I know of.

By authorizing such vague statements, speculations, and guesswork to prove damages, the majority opinion all but undoes the universally established standard for proving damages.

> The actual damages which will sustain a judgment must be established, not by conjectures or unwarranted estimates of witnesses, but by facts from which their existence is logically and legally inferable. The speculations, guesses, estimates of witnesses, form no better basis of recovery than the speculations of the jury themselves. Facts must be proved, data must be given which form a rational basis for a reasonably correct estimate of the nature of the legal injury and of the amount of the damages which resulted from it, before a judgment of recovery can be lawfully rendered. These are fundamental principles of the law of damages.

*Central Coal & Coke Co. v. Hartman*, 111 F. 96, 98 (8th Cir. 1901) (overturning jury verdict on lost profits based solely on testimony of company president).

While a plaintiff is free to prove damages by circumstantial evidence, "the damages may not be determined by mere speculation or guess." *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931). "Mathematical exactness as to the amount is not required but the evidence must form a basis for a reasonable approximation." *United States v. Griffith, Gornall & Carman, Inc.*, 210 F.2d 11, 13 (10th Cir. 1954) (overturning lost profits claim on substantial evidence review when only testimony was the testimony of company's president). One searches the federal reporters in vain for a case where the amount of evidence presented here was found sufficient to support a damages award. *See, e.g.*, *Kassim v. City of Schenectady*, 415 F.3d 246, 250 (2d Cir. 2005) (plaintiff's "vague, conclusory assertions" of lost profits could not support compensatory damages); *Silor v. Romero*, 868 F.2d 1419, 1422 (5th Cir. 1989) ("A jury needs more to base its award of lost business profits than testimony from the plaintiff that he has 'suffered substantial damages'").

Had Brian Hamilton anticipated our lax attitude in this case, he could have multiplied his value assessment several times over because he was not required to provide any business records to corroborate the company's alleged damages by any objective standard. His only limit on the inflation of his damages would have been his own conscience. As it is, based on the company's purchase price of $350,000 and losses thereafter every month totaling $281,000, Hamil-

ton was allowed to speculate that seven months later, the business was worth $4 million, even though all projections were negative.

The majority opinion generously attempts to mend Hamilton's deficiencies, but without record support. The opinion presents IGT's $2 million in debt as though it was incurred after Ocean City's suspension of his license. In fact, as Brian Hamilton testified, the $2 million in debt was incurred to capitalize the company long *before* Ocean City's action in suspending IGT's license. The opinion also refers to IGT's asset purchase agreement (entered into to start the business), a profit and loss statement, and a tax return as though they support, rather than doom the claim that there were any damages. Contrary to the majority opinion's statement that these documents are "other evidence presented by IGT," these documents were actually introduced *by the defense* to refute Hamilton's claim for damages. And rather than show that IGT was worth $4 million, as Hamilton claimed, they demonstrate the amount of IGT's losses, speaking to the company's extremely weak financial condition *prior* to the license suspension.

Because the plaintiff failed to prove any damages in this § 1983 case, the district court should have entered a judgment in favor of the plaintiff for nominal damages, "typically $1.00." *Price*, 93 F.3d at 1246. Accordingly, I would grant Ocean City's motion for judgment insofar as it relates to an award of damages in the amount of $250,000 and remand to the district court for entry of nominal damages.