**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 08-1157**

C&O MOTORS, INCORPORATED, a West Virginia corporation,

Plaintiff – Appellant,

v.

GENERAL MOTORS CORPORATION, a Delaware corporation,

Defendant - Appellee.

Appeal from the United States District Court for the Southern District of West Virginia, at Charleston.  John T. Copenhaver, Jr., District Judge.  (2:05-cv-00835)

Argued:  January 27, 2009                 Decided:  April 1, 2009

Before MICHAEL, GREGORY, and AGEE, Circuit Judges.

Affirmed by unpublished per curiam opinion.

**ARGUED:** Mark A. Swartz, SWARTZ LAW OFFICES, St. Albans, West Virginia, for Appellant.  Mark S. Lillie, KIRKLAND & ELLIS, L.L.P., Chicago, Illinois, for Appellee.  **ON BRIEF:** Allyson H. Griffith, Mary Jo Swartz, SWARTZ LAW OFFICES, St. Albans, West Virginia, for Appellant.  John H. Tinney, THE TINNEY LAW FIRM, P.L.L.C., Charleston, West Virginia; Michael A. Duffy, KIRKLAND & ELLIS, L.L.P., Chicago, Illinois, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

This appeal arises out of General Motors, Inc.'s (GM's) decision to phase out its Oldsmobile line of vehicles during the period from 2001 to 2004. Only weeks before GM announced its decision to terminate the Oldsmobile line, GM entered into a five-year Dealer Agreement with C&O Motors, Inc. (C&O) whereby GM agreed to provide C&O with Oldsmobiles to be sold at C&O's dealership. When C&O was informed by GM of the impending phase-out of Oldsmobile, C&O, without consultation with GM, purchased the blue sky rights to a nearby Nissan dealership in order to mitigate for the anticipated loss of Oldsmobile sales. The Nissan franchise proved successful for C&O and appreciated sufficiently in value to offset all losses C&O claims to have incurred in lost profits and in its "mitigation" efforts. C&O nevertheless brought suit seeking recovery from GM for a variety of damages including the cost incurred in purchasing the Nissan franchise, the cost of separating the GM and Nissan facilities on its premises, and lost profits from the decline in Oldsmobile business during the latter four years of the Dealer Agreement. C&O also alleges that GM committed numerous violations of the West Virginia motor vehicle dealership statute stemming from GM's conduct relating to C&O's purchase of the Nissan franchise. Because, by its own admission, C&O has suffered no actual loss, we hold that its

2

breach of contract action fails as a matter of law.  We also conclude that none of C&O's claims under the dealership statute are meritorious.  Accordingly, we affirm the judgment of the district court.

I.

In 2000 C&O and GM entered into a Dealer Agreement pursuant to which GM agreed to provide Oldsmobiles to C&O for five years beginning November 1, 2000, and ending October 31, 2005.  A numerical quantity was not specified, but Article 4.1 of the Dealer Agreement provides that:

> Because General Motors distributes its Products through a network of authorized dealers operating from approved locations, those dealers must be appropriate in number, located properly, and have proper facilities to represent and service General Motors Products competitively and to permit each dealer the opportunity to achieve a reasonable return on investment if it fulfills its obligations under its Dealer Agreement.

J.A. 1206.

In December 2000 GM announced that it was phasing out its Oldsmobile line of vehicles over the coming years.  GM offered assistance to Oldsmobile dealers during the phase-out in the form of a Transitional Financial Assistance Program (TFAP) that included repurchasing of new and unused vehicle inventory, signs, essential tools, and parts and accessories.  The TFAP also included a supplemental transition assistance payment to be tailored to the individual circumstances of each dealer.

3

C&O declined GM's assistance. Instead, in 2001 C&O, ostensibly to mitigate for the impending phase-out, purchased the blue sky rights to Lester Raines Nissan for $1 million. It then entered into a contact with Nissan North America, Inc. (Nissan) whereby it agreed to provide separate facilities for the Nissan dealership and laid out a time frame for separating the Nissan and GM facilities. On December 17, 2001, C&O's general manager, Paul Walker, informed GM that C&O had applied for a Sales and Services Agreement from Nissan and that the GM and Nissan sales departments would be in the same building initially but would be totally separated after a period of two years. C&O began selling Nissan vehicles in 2002.

On April 17, 2002, GM sent C&O's principal, James Love, a proposed letter agreement for his execution. The letter informed C&O that the addition of the Nissan dealership to the GM facility without the prior approval of GM would constitute a material breach of the Dealer Agreement. The letter included provisions stating that C&O agreed that the costs and expenses incurred to effectuate the separation of the Nissan dealership were to be paid by C&O and that the letter agreement was made and executed under C&O's own free will and C&O was not influenced, coerced, or induced to enter into the agreement by any representations or promises of GM not set forth in the letter. The letter agreement further provided that it could be

4

enforced with equitable relief and that C&O must pay GM's attorney's fees if GM prevails in enforcing the letter agreement.

In response, Love struck certain provisions from the letter agreement, including the provision asserting that the addition of the Nissan dealership without GM's approval constituted breach of the Dealer Agreement and the provision regarding enforcement of the letter agreement. Love initialed the changes, signed the letter, and returned it to GM on June 10, 2002. Love did not strike the provisions of the letter requiring C&O to separate the Nissan and GM dealership facilities within two years.

On September 14, 2005, C&O served GM with a three-count complaint alleging actual and anticipatory breach of the Dealer Agreement and violations of West Virginia's motor vehicle dealership statute. C&O initially claimed damages in the form of $2.47 million in "mitigation costs" incurred when it purchased the Nissan dealership and when it separated the Nissan and GM dealership facilities. In ruling on GM's motion for summary judgment, the court concluded that C&O's claim for "mitigation costs" failed as a matter of law because C&O conceded that it had profited from its mitigation, and C&O was only entitled to expectation damages for a breach of contract.

5

At the same time the district court dismissed the majority of C&O's other claims.

With the mitigation damages claim dismissed, C&O added a claim for lost profits. To ascertain lost profits, C&O's general manager, Walker, conducted an analysis of actual versus anticipated Oldsmobile sales, which relied entirely on data from a single baseline year to generate its predictions. On GM's motion the district court required that Walker testify as an expert and submit an expert report pursuant to Fed. R. Civ. P. 26(a)(2)(B). GM then challenged Walker's report as failing to meet Federal Rule of Evidence 702's standards for admissibility of expert testimony as clarified by the Supreme Court in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), and Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999). The district court agreed with GM, but gave Walker an opportunity to amend his report in accordance with the Daubert and Kumho standards. Walker declined to do so and instead submitted a letter defending his analysis. Despite expressing its disapproval of Walker's failure to amend his expert report, the district court elected to allow the case to proceed to trial, stating that: "Walker may defend his lost profits opinion at trial, and GM may renew its motion [to exclude Walker's evidence] at that time." J.A. 972. At trial C&O attempted to use Walker's lost profits analysis, and GM renewed its motion. Because Walker had

6

produced no further analyses that met the requirements of Rule 702 and because the district court refused to permit Walker to testify about the contents of his prior report, C&O was forced to rest its case without presenting concrete data on lost profits. GM subsequently moved for judgment as a matter of law, and the district court granted the motion. This appeal followed.

## II.

The district court's award of summary judgment to GM on C&O's claim for mitigation damages is reviewed de novo, with the facts viewed in the light most favorable to C&O. See Toll Bros., Inc. v. Dryvit Sys., Inc., 432 F.3d 564, 568 (4th Cir. 2005). The district court's grant of judgment as a matter of law to GM on C&O's lost profits claim is also reviewed de novo. Int'l Ground Transp. v. Mayor & City Council of Ocean City, 475 F.3d 214, 218 (4th Cir. 2007).

## A.

GM is charged with breaching its Dealer Agreement with C&O by phasing out the Oldsmobile line before the end of the agreement. C&O originally claimed entitlement to $2,473,456 in "mitigation costs" connected with its purchase of Lester Raines Nissan in anticipation of GM's impending breach of the Agreement. These damages included (1) the cost of acquiring the Nissan franchise plus a limited amount of furnishings, fixtures,

7

and tools; (2) the costs related to the construction or renovation of dealership facilities; (3) the fair market rental value of the facilities that temporarily accommodated the Nissan showroom during construction and renovation; and (4) statutory interest at 10% per year through July 2006. After C&O's claim for "mitigation costs" was rejected by the district court, C&O added a claim for lost profits based on forecasted lost business during the phase-out of the Oldsmobile line. According to the report generated by Walker, C&O's lost profits from Oldsmobile vehicle sales, trade-ins, and parts and service during the years 2002-2005 amounted to $1,972,985. The district court concluded that Walker's expert report failed to comply with the requirements of Federal Rule of Evidence 702 and refused to admit his testimony and report about lost profits into evidence at trial.

On appeal C&O challenges the denial of $1,526,641 of its purported "mitigation costs" claim as well as the rejection of its lost profits analysis. C&O argues specifically that it is entitled to the $1 million it paid for the blue sky rights to Lester Raines Nissan in addition to the $526,641 it paid to separate the Nissan and Chevrolet/Oldsmobile dealership facilities, and it reasserts its entitlement to the alleged lost profits as calculated by Walker.

C&O's claim for damages relies on an unsupportable argument with respect to the consequences of mitigation and the nature of compensatory damages in a contract action. Although reasonable mitigation costs are generally recoverable, recovery is subject to a requirement of actual loss.

A party is entitled to recover as incidental losses damages incurred in a reasonable effort, whether successful or not, to avoid harm once the party has reason to know that performance by the other party will not be forthcoming. Restatement (Second) of Contracts § 350 & cmt. b (1981); see also id., § 347 cmt. d ("[T]he injured party is expected to take reasonable steps to avoid further loss."). Although the reasonableness of mitigation is a question of fact, 22 Am. Jur. 2d Damages § 344 (2003), and thus properly resolved by a jury, the net effect of the actions taken by C&O in this case to mitigate for GM's impending breach renders a determination of their reasonableness unnecessary.

A plaintiff in a contract action is only entitled to be put in the same economic position that it would have been in had the contract not been breached. See Ohio Valley Builders' Supply Co. v. Wetzel Constr. Co., 151 S.E. 1, 4 (W. Va. 1929); 22 Am. Jur. 2d Damages § 28 (2003) ("The sole object of compensatory damages is to make the injured party whole for losses actually suffered; the plaintiff cannot be made more than

9

whole, make a profit, or receive more than one recovery for the same harm. . . .  The plaintiff is not entitled to a windfall, and the law will not put him in a better position than he would be in had the wrong not been done or the contract not been broken.").

The Restatement (Second) of Contracts makes clear that "[i]f the injured party avoids further loss by making substitute arrangements for the use of his resources that are no longer needed to perform the contract, the net profit from such arrangements is . . . subtracted [from the injured party's damage award]."  Restatement (Second) of Contracts § 347 cmt. d (1981).

When this principle is applied to the present case, it becomes clear that C&O has suffered no economic loss and therefore no legally cognizable damage as a result of GM's alleged breach.  C&O concedes that the Nissan dealership whose blue sky rights it purchased for $1 million in 2001 was, by 2006, worth "[t]wo and a half million blue sky.  [Two million] at least, blue sky."  J.A. 141.  And "[t]he business and the tools and the equipment and the franchise would be worth five million."  J.A. 141; see also J.A. 140 ("[I]t's worth five million[,] four and [sic] half maybe to the right buyer").

C&O has alleged losses of $1,526,641 in mitigation costs plus $1,972,985 in lost profits during the years 2002-

2005. C&O's total claimed loss is therefore $3,499,626. At the same time, C&O, through its purported mitigation, had acquired a Nissan dealership with a total value in 2006 of $5 million. This $5 million does not even take into account C&O's profits from the sale of at least 2,000 Nissan vehicles between 2002 and 2005. Based on C&O's own appraisal of the value of the Nissan dealership in 2006, the Nissan dealership's increase in value has more than compensated C&O for all of its "mitigation damages" and lost profits. Because there is no loss, C&O's breach of contract claim must therefore fail.

B.

C&O makes an additional statutory argument that it is entitled to compensation for the expenses it incurred in separating the Nissan and Chevrolet facilities pursuant to W. Va. Code § 17A-6A-10(1). This claim has no merit. Section 17A-6A-10(1) provides that:

> A manufacturer . . . may not require any new motor vehicle dealer in this State to do any of the following: . . .
>
> (f) . . . Notwithstanding the terms of any franchise agreement, a manufacturer . . . may not enforce any requirements, including facility requirements, that a new motor vehicle dealer establish or maintain exclusive facilities, personnel or display space, when the requirements are unreasonable considering current economic conditions and are not otherwise justified by reasonable business considerations. The burden of proving that current economic conditions or reasonable business considerations justify exclusive facilities

11

is on the manufacturer . . . and must be proven by a preponderance of the evidence.

W. Va. Code Ann. § 17A-6A-10(1) (West 2002).

In pressing this claim, C&O fails to acknowledge two important facts. First, under Article 4.4.2 of the Dealer Agreement, C&O was required to obtain GM's prior written approval before adding a new vehicle line. C&O failed to do so before adding the Nissan line in 2001. Second, C&O specifically agreed in its contract with Nissan, entered into four and a half months prior to the April 17, 2002, letter from GM, that it would maintain separate facilities for the Nissan dealership. Having asserted no reason to doubt the validity of its agreement with Nissan, C&O cannot claim that GM's insistence that the Nissan and GM facilities be separated within two years was "unreasonable considering current economic conditions" or "not otherwise justified by reasonable business considerations." Id. Rather, C&O's prior contractual obligation with Nissan to separate the facilities undercuts any argument that GM's later demands were unreasonable or unjustified or caused the need for separation.

### III.

The district court rejected a number of claims made by C&O alleging violations of the West Virginia Code arising out of the April 17, 2002, letter agreement. The district court's

12

rulings on a number of these claims were noted as error in the statement of issues section of C&O's opening brief. But only two -- alleged violations of W. Va. Code §§ 17A-6A-10(1)(d) and (h) -- were substantively argued in the brief. Accordingly, we consider the remaining assignments of error to be abandoned. See Edwards v. City of Goldsboro, 178 F.3d 231, 241 n.6 (4th Cir. 1999). We address the two argued claims in turn.

                                    A.

C&O first contends that GM violated W. Va. Code § 17A-6A-10(1)(d) by impermissibly threatening to terminate the Dealer Agreement in the April 17, 2002, letter.

Section 17A-6A-10(1)(d) forbids any manufacturer or distributer from requiring any new motor vehicle dealer in West Virginia to

> Enter into any agreement with the manufacturer or distributor or do any other act prejudicial to the new motor vehicle dealer by threatening to terminate a dealer agreement or any contractual agreement or understanding existing between the dealer and the manufacturer or distributor. Notice in good faith to any dealer of the dealer's violation of any terms or provisions of the dealer agreement is not a violation of this article.

W. Va. Code Ann. § 17A-6A-10(1)(d) (West 2002).

Contrary to C&O's assertion the April 17, 2002, letter was not an impermissible threat to terminate the Dealer Agreement. The letter as originally received by C&O provided that: "As we discussed, the addition of Nissan without the prior

                                    13

written approval of GM is a material breach of the C&O Motors GM Dealer Sales and Services Agreement, and if not cured, grounds for termination of the Dealer Agreement." J.A. 648. The letter makes clear that GM would not "proceed further or exercise any other legal or equitable remedy for this breach" if C&O complied with certain specified terms, including separation of the Chevrolet/Oldsmobile and Nissan facilities by December 17, 2003 (the date by which C&O had already informed GM it would have the facilities separated) and assumption of the costs of separating the facilities. J.A. 648-49.

The April 17 letter correctly stated C&O's obligations under the Dealer Agreement: addition of the Nissan dealership without the prior written authorization of GM would violate Article 4.4.2 of the Agreement. The statute makes clear that "[n]otice in good faith to any dealer of the dealer's violation of any terms or provisions of the dealer agreement is not a violation of this article." W. Va. Code Ann. § 17A-6A-10(1)(d) (West 2002). The statement in the letter was therefore not an impermissible threat. Further, even if C&O perceived the above language in the Letter Agreement as threatening, Love excised the offending provision, along with several other provisions of the letter agreement before signing and returning it to GM in June 2002.

14

B.

C&O also alleges that GM violated § 17A-6A-10(1)(h). This section provides that a manufacturer or distributor may not require a new motor vehicle dealer to "[p]rospectively assent to a release, assignment, novation, waiver or estoppel which would relieve any person from liability imposed by this article . . . ." W. Va. Code Ann. § 17A-6A-10(1)(h) (West 2002).

C&O contends that the letter agreement compelled it to prospectively assent to release its claim against GM for the cost of separating the GM and Nissan facilities. This claim fails for several reasons. Properly viewed, Love's signing of the April 17, 2000, letter agreement was not an assent to a prospective release of claims but rather consideration for the discharge of a contractual obligation. See Jackson v. Jackson, 99 S.E. 259, 262-63 (W. Va. 1919) (holding that release "founded upon a valuable consideration" is "binding upon the releasor"); see also 1 E. Allan Farnsworth, Farnsworth on Contracts § 4.24 (2d ed. 1998). Under Article 4.4.2 of the Dealer Agreement,

> If Dealer wants to make any change in location(s) or Premises, or in the uses previously approved for those Premises, Dealer will give General Motors written notice of the proposed change, together with the reasons for the proposal, for General Motors evaluation and final decision in light of dealer network planning considerations. No change in location or in the use of Premises, including addition or any other vehicle lines, will be made without General Motors prior written authorization pursuant to its business judgment.

15

J.A. 1208. C&O breached this provision of the Agreement when it failed to obtain prior approval from GM to add the Nissan vehicle line. In the April 17 letter agreement GM offered to discharge this contractual breach on condition that C&O release any claim seeking compensation for the cost of separating the Nissan and GM facilities. C&O was therefore not required to release its claims relating to separation costs as proscribed by § 17A-6A-10(1)(h). Rather, by signing and returning the letter agreement, C&O was agreeing that release of the separation cost claim would serve as consideration for GM overlooking C&O's prior contractual breach.

## IV.

Because we have determined above that C&O cannot prevail on its claim for damages in this case, we need not reach C&O's challenge to the district court's determination that C&O's general manager Paul Walker was required to present his damages analysis under Federal Rule of Evidence 702 and the standards set forth in Daubert and Kumho Tire. Similarly, we need not review the district court's decision to dismiss C&O's action as a matter of law after C&O had rested its case without being permitted to introduce Walker's testimony with respect to lost profits.

16

\* \* \*

The judgment of the district court is

AFFIRMED.